# 25-2363

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

———————————

ETON PARK CAPITAL MANAGEMENT, L.P., ETON PARK MASTER FUND, LTD., ETON PARK FUND, L.P.,

*Plaintiffs-Appellees,*

v.

ARGENTINE REPUBLIC,

*Defendant-Appellant,*

———————————

On Appeal from the United States District Court for the Southern District of New York, No. 15-cv-2739

———————————

## RESPONSE BRIEF FOR PLAINTIFFS-APPELLEES
———————————

MARK C. HANSEN
DEREK T. HO
ANDREW E. GOLDSMITH
KELLOGG, HANSEN, TODD,
FIGEL, & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, DC 20036

PAUL D. CLEMENT
C. HARKER RHODES IV
NICHOLAS A. AQUART
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com

*Counsel for Plaintiffs-Appellees*
*(Additional Counsel Listed on Inside Cover)*

December 18, 2025

SETH L. LEVINE
ALISON M. BONELLI
LEVINE LEE LLP
400 Madison Avenue, 8th Floor
New York, NY 10017

**CORPORATE DISCLOSURE STATEMENT**

Pursuant to Federal Rule of Appellate Procedure 26.1(a), Plaintiffs-Appellees state the following:

Eton Park Capital Management, L.P., Eton Park Master Fund, Ltd., and Eton Park Fund, L.P. (together "Eton Park") are non-governmental entities that have no parent corporations. No public corporation owns 10% or more of the stock of either Eton Park Capital Management, L.P. or Eton Park Fund, L.P. Eton Park Master Fund, Ltd. is in liquidation; Burford Capital Limited, a public corporation, indirectly acts as its liquidator and owns more than 10% of its stock.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................... iv

INTRODUCTION ................................................................................. 1

JURISDICTIONAL STATEMENT ..................................................... 6

STATEMENT OF THE ISSUES ......................................................... 7

STATEMENT OF THE CASE ............................................................. 7

    A.    Argentina and YPF Amend YPF's Bylaws and Promise Investors Strong Tender-Offer Protections ............................. 7

    B.    Argentina and YPF Breach Their Obligations Under the Bylaws Tender-Offer Provisions ......................................... 9

    C.    The District Court Enters Judgment for Plaintiffs Against Argentina, and Argentina Declines to Obtain a Stay ......................... 11

    D.    Argentina Evades Plaintiffs' Discovery Requests ............................ 13

    E.    The District Court Grants Discovery of Off-Channel Communications ................................................................ 15

    F.    The Discovery Process Remains Ongoing. ....................................... 19

SUMMARY OF ARGUMENT ........................................................... 21

STANDARD OF REVIEW ................................................................. 24

ARGUMENT ...................................................................................... 25

I.    This Court Lacks Jurisdiction To Review The District Court's Discovery Order ................................................................. 25

II.    The District Court Did Not Abuse Its Discretion In Determining That Argentina Has Control Over Its Officials' Off-Channel Communications ................................................................ 34

    A.    The District Court Properly Determined That Argentina Has the Practical Ability to Obtain the Off-Channel Communications ................................................................ 34

ii

B.      The District Court Properly Determined That Argentina Has the Right and Authority to Obtain the Off-Channel Communications ................................................................. 41

III.    The District Court Did Not Abuse Its Discretion In Finding The Requested Discovery Relevant And Proportional ......................................... 44

A.      The District Court Properly Determined That the Requested Discovery Is Relevant .......................................................... 45

B.      The District Court Properly Determined That the Requested Discovery Is Not Unduly Burdensome ............................................... 51

CONCLUSION ................................................................................................ 54

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases**

*Argentine Republic v. Petersen Energia Inversora*,
Nos. 23-7370, 23-7463, 23-7614 (2d Cir. argued Oct. 29, 2025) ......................13

*Aurelius Cap. Master, Ltd. v. Republic of Argentina*,
589 F.App'x 16 (2d Cir. 2014).................................................. 32, 50

*Cheney v. U.S. Dist. Ct.*,
542 U.S. 367 (2004).................................................................31

*Chevron Corp. v. Salazar*,
275 F.R.D. 437 (S.D.N.Y. 2011) ........................................................35

*EM Ltd. v. Republic of Argentina*,
695 F.3d 201 (2d Cir. 2012)........................................... 24, 32, 51, 52

*Eton Park Cap. Mgmt. L.P. v. Argentine Republic*,
No. 25-1689 (2d Cir. filed July 10, 2025) ........................................13

*First City, Tex. Hou., N.A. v. Rafidain Bank*,
281 F.3d 48 (2d Cir. 2002) ...........................................................45

*First Tech. Cap., Inc. v. Airborne, Inc.*,
380 F.Supp.3d 217 (W.D.N.Y. 2019).................................................45

*Garcetti v. Ceballos*,
547 U.S. 410 (2006).................................................................38

*In re "Agent Orange" Prod. Liab. Litig.*,
517 F.3d 76 (2d Cir. 2008)............................................................52

*In re Air Crash at Belle Harbor*,
490 F.3d 99 (2d Cir. 2007)............................................................25

*Linde v. Arab Bank, PLC*,
706 F.3d 92 (2d Cir. 2013) ...................................................... 27, 29

*Lindke v. Freed*,
601 U.S. 187 (2024)..................................................................38

*Lora v. O'Heaney*,
602 F.3d 106 (2d Cir. 2010) ............................................................ 24, 27, 28, 30

*Miniace v. Pac. Mar. Ass'n*,
2006 WL 335389 (N.D. Cal. Feb. 13, 2006) .................................................35

*Mirlis v. Greer*,
80 F.4th 377 (2d Cir. 2023) ........................................................... 34, 37

*Mohawk Indus., Inc. v. Carpenter*,
558 U.S. 100 (2009) ............................................................ *passim*

*Morrison v. Nat'l Austl. Bank Ltd.*,
561 U.S. 247 (2010) ....................................................................8

*OI Eur. Grp. B.V. v. Bolivarian Republic of Venezuela*,
663 F. Supp. 3d 406 (D. Del. 2023) ......................................................48

*OI Eur. Grp. B.V. v. Bolivarian Republic of Venezuela*,
73 F.4th 157 (3d Cir. 2023) ...........................................................48

*Oppenheimer Fund, Inc. v. Sanders*,
437 U.S. 340 (1978) ................................................................45

*Outlaw v. City of Hartford*,
884 F.3d 351 (2d Cir. 2018) .........................................................54

*Petersen Energía Inversora S.A.U. v. Argentine Republic*,
895 F.3d 194 (2d Cir. 2018) ........................................................ *passim*

*Petersen Energia Inversora, S.A.U. v. Argentine Republic*,
No. 25-1687 (2d Cir. filed July 10, 2025) ........................................13

*Peterson v. Bank Markazi*,
121 F.4th 983 (2d Cir. 2024) ...................................................... 50, 51

*Republic of Argentina v. NML Cap., Ltd.*,
573 U.S. 134 (2014) ................................................................50

*Sekhar v. United States*,
570 U.S. 729 (2013) ................................................................43

*Shcherbakovskiy v. Da Capo Al Fine, Ltd.*,
  490 F.3d 130 (2d Cir. 2007) ............................................................ 34, 37

*Smith v. Pergola 36 LLC*,
  2022 WL 17832506 (S.D.N.Y. Dec. 21, 2022) .................................35

*Société Nationale Industrielle Aerospatiale v. U.S. Dist. Ct.*,
  482 U.S. 522 (1987) ..........................................................................41

*United States v. Abu–Jihaad*,
  630 F.3d 102 (2d Cir. 2010) .............................................................45

*United States v. Rubin*,
  37 F.3d 49 (2d Cir. 1994) .................................................................45

*Vera v. Republic of Cuba*,
  802 F.3d 242 (2d Cir. 2015) ................................................. 25, 26, 30

*Will v. Hallock*,
  546 U.S. 345 (2006) ..........................................................................27

**Statutes**

28 U.S.C. §1292(b) ................................................................................31

28 U.S.C. §1330(a) ..................................................................................6

**Rules**

Fed. R. Civ. P. 26(b)(1) .........................................................................45

Fed. R. Civ. P. 34(a)(1) ..........................................................................34

**Other Authorities**

Federal Practice & Procedure (2d ed. 1992) ..........................................25

Federal Practice & Procedure (3d ed. 2025) .............................. 26, 30, 35

**INTRODUCTION**

This appeal involves the kind of ongoing and developing discovery dispute that is almost never appealable. Argentina believes that some combination of its sovereign status and the fact that this discovery dispute arises in the post-judgment context entitles it to an exception to that settled rule. Argentina is wrong. This Court has already rejected Argentina's claim to immunity under the Foreign Sovereign Immunity Act ("FSIA"), in a prior appeal that involved the rare kind of issue that actually justifies an interlocutory appeal. In light of that ruling, Argentina has no more ability to appeal ordinary discovery disputes than any other litigant. That is equally true in the post-judgment context. Indeed, the only reason this discovery dispute arises at this juncture is that Argentina has not sought a stay of the judgment against it but has opted instead to engage in massive resistance to any efforts to enforce that judgment or even seek discovery in aid of enforcing the judgment, and it thinks it can delay justice further by appealing any adverse post-judgment discovery orders. This Court should not reward that strategy. It should instead either dismiss this appeal or affirm a discovery order that fully complies with common sense and applicable law.

After more than a decade of litigation, the district court below entered judgment against Argentina for breaching its clear contractual obligations by refusing to make a tender offer to Plaintiffs for their shares in the energy company

1

YPF S.A. ("YPF"). That judgment was unsurprising, particularly given that Argentina knew when it breached that complying with its tender-offer obligations would cost it billions and that breaching those obligations would inflict billions of dollars in damages on Plaintiffs. Rather than meet the modest conditions that the district court set for a stay of that judgment or seek a stay from this Court, Argentina has opted to resist every effort by Plaintiffs to enforce the unstayed judgment or even obtain meaningful discovery in aid of those efforts.

As relevant here, Plaintiffs have sought discovery from Argentina to ascertain whether certain Argentine state-owned enterprises are alter egos of Argentina itself. In response to those discovery requests, Argentina produced a minimal number of communications regarding those state-owned enterprises that were made or received by its public officials through official government channels. It refused, however, to produce its officials' communications relating to those state-owned enterprises that were made or received outside of official government channels, including over WhatsApp, Gmail, Signal, and other email and messaging platforms (so-called "off-channel communications"), on the asserted ground that it had no practical ability to obtain those off-channel communications.

The district court rejected Argentina's selective and self-serving approach to its discovery obligations. After Plaintiffs produced extensive public evidence showing that Argentine public officials routinely use off-channel communications to

2

conduct official business, the district court carefully scrutinized Plaintiffs' preliminary showing with respect to each Argentine official and state-owned enterprise as to which Plaintiffs sought discovery, and made specific findings concluding that for some (but not all) of those officials and state-owned enterprises, discovery of the officials' relevant off-channel communications was warranted under the Federal Rules to enable Plaintiffs to seek to enforce their unstayed judgment.

Argentina's appeal from that well-reasoned order is interlocutory in the extreme—as the subsequent shifts in Argentina's position and the ongoing discovery process below make obvious. When Argentina first filed this appeal, it claimed that as to the 36 of its current and former officials at issue, it had no practical ability to obtain their off-channel communications at all. Since then, Argentina has entirely reversed course and has agreed to produce off-channel communications from at least 16 of those officials (and has actually started that production), and Argentina is still holding open the possibility that it may produce off-channel communications as to 14 others. For the 6 remaining officials, the district court has ordered the parties to confer on a briefing schedule in connection with Plaintiffs' forthcoming motion for contempt and sanctions, and has yet to take up the issue of what further production will be required or what other remedies will be imposed. Those constantly developing issues underscore the sensible basis for the long-settled rule that discovery rulings are not subject to immediate appellate review.

3

Argentina thinks it can appeal now anyway, claiming (without offering any record evidence) that it has no practical ability to obtain its public officials' off-channel communications concerning their official business—even though Argentina has now already produced some off-channel communications from many of those officials and warranted that it will produce more. Argentina's appeal fails at the threshold, because this Court has no appellate jurisdiction to review interlocutory discovery orders. Argentina invokes the collateral order doctrine, but the district court's order here fails at least two of the three requirements for that doctrine, as the district court's order (1) did not conclusively determine the underlying issue of what specific off-channel communications Plaintiffs would be able to obtain (and indeed, that issue is still being actively litigated in the district court), and (2) is not effectively unreviewable on appeal. This appeal should therefore be dismissed for lack of jurisdiction.

If this Court reaches the merits of this appeal, it will find them lacking. The discovery order here fell well within the district court's broad discretion to manage the post-judgment discovery process. As its lead argument, Argentina contends that the district court abused its discretion in concluding that Argentina has the practical ability to obtain its public officials' off-channel communications concerning their official duties. That argument is as strained as it sounds. The district court properly concluded that Argentina (like any other employer) has the practical ability to obtain

its officials' work-related communications, even when its officials have chosen to make those work-related communications through unofficial channels—as demonstrated by the fact that Argentina has now agreed to produce off-channel communications from 16 officials, and may soon produce off-channel communications from 14 more.

Argentina says it has no authority under Argentine law to forcibly seize its public officials' cellphones, but no one contends that Argentina is required to invoke its governmental power to take that drastic approach; instead, Argentina, like any other employer, need only direct its officials to produce any work-related communications regarding the relevant state-owned enterprises that they may have sent or received through unofficial platforms, and impose appropriate sanctions (up to and including termination) on any officials who refuse to comply. Argentina cites no law, Argentine or otherwise, that would prevent it from doing what any ordinary employer could do, which suffices to show that Argentina has the practical ability to obtain the relevant communications. And even if Argentina lacked that practical ability, the district court correctly concluded that Argentina has the legal right and authority to obtain the requested communications as public documents under Argentine law. The district court therefore did not abuse its discretion in rejecting Argentina's unlikely claim that it has no control over communications by its public officials concerning their official business. And to the extent Argentina may persist

5

in refusing to produce off-channel communications from a small set of the officials at issue, the district court has already indicated that there will be further factual development with respect to that refusal, and that process should be allowed to proceed in the normal course.

Alternatively, Argentina contends that the requested discovery is irrelevant and disproportionate. Even putting aside the fundamental mismatch between the strict requirements of the collateral order doctrine and Argentina's abuse-of-discretion arguments, the district court's rulings on those issues fall well within its broad discretion to manage the discovery process, and Argentina's contrary arguments (which largely ignore the district court's detailed review of the record) come nowhere close to showing that the experienced district-court judge who has been presiding over this litigation for nearly a decade abused that broad discretion. This Court should dismiss the appeal for lack of jurisdiction or affirm.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction over this case under 28 U.S.C. §1330(a). This Court lacks jurisdiction over this appeal, because the discovery order that Argentina challenges is interlocutory and not appealable under the collateral-order doctrine. *See infra* pp.25-33.

## STATEMENT OF THE ISSUES

1. Whether this Court has jurisdiction over this interlocutory appeal from a discovery order that does not conclusively determine the disputed issues and is not effectively unreviewable on appeal.

2. Whether the district court acted within its discretion in determining that Argentina has the practical ability to obtain its public officials' off-channel communications concerning official business.

3. Whether the district court acted within its discretion in determining that given Argentina's minimal production of official-channel communications, the requested discovery of off-channel communications was relevant and proportional.

## STATEMENT OF THE CASE

### A.  Argentina and YPF Amend YPF's Bylaws and Promise Investors Strong Tender-Offer Protections.

YPF was founded in 1922 as a "politically managed, government-owned monopoly." Dist.Ct.Dkt.112-2 at 16, 41. In the 1990s, however, a new regime in Argentina embarked upon an ambitious turn toward free-market principles, with the privatization of YPF through an IPO tapping into U.S. markets as its cornerstone. *See Petersen Energía Inversora S.A.U. v. Argentine Republic*, 895 F.3d 194, 199 n.1 (2d Cir. 2018). Considering Argentina's "checkered economic past" and "persistent economic ills," however, foreign investors were "very skeptical" of whether

7

Argentina's newfound commitment to privatization would last. Dist.Ct.Dkt.364-26 at ¶19.

To overcome that skepticism, Argentina and YPF amended YPF's Bylaws "to incorporate protections for investors from (1) hostile takeovers and (2) attempts by Argentina to renationalize the company." *Petersen*, 895 F.3d at 199. Under §7 of the amended Bylaws, shareholders wishing to acquire control of 15% or more of YPF were obligated to make a tender offer to all shareholders at a price calculated based on a formula set in the Bylaws. *Id*. Section 28 specifically extended similar requirements to the Argentine government, ensuring shareholders a compensated exit at a specified price in the event of re-nationalization. Dist.Ct.Dkt.363-1 at 29.

Argentina ultimately "raised billions of dollars in investment capital" through the privatization of YPF, with "the largest share (more than $1.1 billion in total) coming from the sale of ADRs in the United States on the NYSE [New York Stock Exchange]." *Petersen*, 895 F.3d at 200.[1] The protections afforded by the Bylaws were "critical" to the IPO's success, as Argentina "likely could not have achieved the valuation it did at the time of its IPO, or even completed the IPO itself, without

---

[1] American depositary receipts ("ADRs") are certificates that represent an ownership interest in foreign securities, allowing investors to acquire equity in foreign companies on U.S. stock exchanges via dollar-denominated transactions. *See, e.g.*, *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 251 (2010).

providing prospective investors with protections" like those the amended Bylaws embodied. Dist.Ct.Dkt.364-26 at ¶¶11, 50.

Following the IPO, Petersen and Eton Park became significant shareholders in YPF by purchasing NYSE-listed ADRs. When Petersen crossed the 15% threshold set forth in §7 of the Bylaws, it fully complied with that section's tender-offer requirements. By the spring of 2012, Petersen and Eton Park were the second- and third-largest investors in YPF. Dist.Ct.Dkt.364-49 at ¶¶16-17.

**B.      Argentina and YPF Breach Their Obligations Under the Bylaws Tender-Offer Provisions.**

In 2011, Argentina began a campaign to retake control of YPF by depressing YPF's share price and ultimately seizing a majority stake in the company. *See* Dist.Ct.Dkt.364-86 at 16307; Dist.Ct.Dkt.364-53 at 13. The Bylaws, however, presented a major obstacle to that strategy. On February 21, 2012, Argentine Secretary of Energy Daniel Cameron sent a memorandum to Roberto Baratta, the government's appointed YPF board member, recognizing that the Bylaws were "carefully intended at the outset to defend its future minority shareholders," and estimating that if Argentina complied with the Bylaws' tender-offer requirements, Argentina would have to pay "between 11 billion and 14.5 billion dollars." Dist.Ct.Dkt.364-81 at 69040-41. In Cameron's view, "this is not the path that will allow us greater possibilities." Dist.Ct.Dkt.364-81 at 69041. Instead, he stressed, "[t]he only way to go is expropriation." Dist.Ct.Dkt.364-81 at 69041 (emphasis

9

omitted). That was so, he advised, even though the failure to make a tender offer would "probably involve lawsuits." Dist.Ct.Dkt.364-81 at 69042.

On April 16, 2012, Argentina executed its plan to seize control, issuing an executive decree appointing Julio De Vido, Argentina's then-Minister of Planning, Public Investment, and Services as "Intervenor" with the powers of YPF's Board of Directors and President, and another decree appointing Axel Kicillof, then-Secretary of Economic Policy and Development Planning, as "Vice-Intervenor." *See Petersen*, 895 F.3d at 202. The Intervenor "seized control of YPF's facilities, replaced top management with government officials, and escorted YPF's then-CEO off the premises." *Id.*

Argentine officials were "quick to declare that, despite having acquired control of the company, Argentina and YPF had no intention of complying with the tender offer provisions of YPF's bylaws." *Id.* On April 17, 2012—one day after the intervention—Kicillof, speaking as both Argentina's Secretary of Economic Policy and Development Planning and YPF's new Vice-Intervenor, told the Argentine Congress that Argentina and YPF would not honor the Bylaws. Kicillof described as "fools ... those who think that the State has to be stupid and buy everything according to the law of YPF itself, respecting its bylaws," and dismissed the tender-offer requirement as a "bear trap." Dist.Ct.Dkt.481-11 at 25. Consistent with Kicillof's declaration, Argentina never made a tender offer, nor did it comply with

10

the other requirements of §7 and §28. YPF likewise never enforced those requirements, and violated the provisions of §7 and §28 concerning the counting of votes and payment of dividends.

### C. The District Court Enters Judgment for Plaintiffs Against Argentina, and Argentina Declines to Obtain a Stay.

Petersen filed suit against Argentina and YPF in May 2015 for breaching their obligations under the Bylaws. JA.174-203. Argentina and YPF moved to dismiss Petersen's complaint, but the district court denied their motions, holding *inter alia* that Argentina and YPF were not immune from suit under the FSIA because Petersen's claims were based on Argentina's and YPF's commercial activity. *See Petersen*, 895 F.3d at 204. This Court affirmed, *id.* at 204-11, and the Supreme Court denied certiorari, 588 U.S. 906 (2019). Meanwhile, Eton Park filed suit against Argentina and YPF in November 2016. Dist.Ct.Dkt.364-16. The district court designated Petersen's and Eton Park's actions as related, and they have since proceeded in tandem.

The district court subsequently granted summary judgment for Plaintiffs against Argentina on liability, while granting summary judgment for YPF. As to Argentina, the court explained "that Sections 7 and 28 of YPF's Bylaws, on their face, required that [Argentina] make a tender offer upon acquisition of more than 49% of YPF's capital stock," that Argentina acquired control of 51% of YPF's capital stock, and that it "failed to make the tender offer called for by the Bylaws."

11

Dist.Ct.Dkt.437 at 14-15. Argentina therefore plainly breached its contractual obligations. *See* Dist.Ct.Dkt.437 at 17-43.

The district court proceeded to hold a three-day trial on damages in July 2023, where it heard live testimony from multiple expert witnesses on Argentine law and extensive arguments from counsel regarding the correct amount of damages under the Bylaws' specified formula. The court issued its judgment on September 15, 2023, awarding Plaintiffs approximately $16.1 billion in damages. JA.204-07.

Argentina filed a notice of appeal and a motion to stay the judgment pending appeal. Dist.Ct.Dkt.504, 513. The district court granted the stay on two conditions: that Argentina "seek expedited review of its appeal," and provide "minimal security" by pledging certain assets to protect Plaintiffs' interest in collecting on their judgment. JA.213-17. Argentina responded that it would neither comply with the conditions nor seek an expedited appeal. Dist.Ct.Dkt.531 at 1. Instead, Argentina asked the court to reconsider its prior order and grant a stay with no conditions. Dist.Ct.Dkt.531 at 2. The district court denied that motion, explaining that Argentina merely sought to continue its "strategy of procedural delay and obfuscation" by "mouthing an intent to cooperate but refusing to do so." Dist.Ct.Dkt.533 at 2-5. Argentina did not seek a stay from this Court, and so the judgment is currently final and subject to collection. This Court heard argument on Argentina's appeal from

12

that judgment on October 29, 2025. *See Argentine Republic v. Petersen Energia Inversora*, Nos. 23-7370, 23-7463, 23-7614 (2d Cir.).

In April 2024, three months after the district court's judgment became effective, Plaintiffs moved for an order to enforce the judgment by requiring Argentina to (i) transfer its YPF shares to a global custody account at Bank of New York Melon ("BNYM") in New York, and (ii) instruct BNYM to transfer the ownership interests in those shares to Plaintiffs' designees in partial satisfaction of the judgment. Dist.Ct.Dkt.555, 556. The district court granted that motion in June 2025, explaining that the turnover order that Plaintiffs requested was proper under both federal and New York law. JA.1237-69. Argentina's appeals from that order are pending before this Court. *See* Nos. 25-1687, 25-1689 (2d Cir.).

### D. Argentina Evades Plaintiffs' Discovery Requests.

Meanwhile, Plaintiffs have continued to seek discovery relating to Argentina's other assets in an effort to enforce the remainder of the judgment. As relevant here, Plaintiffs served discovery requests on October 16, 2023, seeking information regarding Argentina's relationship with certain state-owned entities that Plaintiffs have reason to believe are alter egos of Argentina, making their assets potentially subject to execution. Those entities include YPF itself, Banco Central de la República Argentina ("BCRA"), Aerolíneas Argentinas S.A. ("Aerolíneas"), Banco

de la Nacion Argentina ("BNA"), Energía Argentina Sociedad Anónima ("ENARSA"), and Empresa Argentina de Soluciones Satelitales ("ARSAT").

In response, Argentina engaged in its usual pattern of obfuscation and delay. In January 2024, after three months and eight meet-and-confer sessions, Plaintiffs sought assistance from the district court, which ordered Argentina to substantially complete its production of responsive documents within one month. PSA.28-32. Argentina failed to comply with that order. Six months after Plaintiffs served their requests, Argentina continued to object at every turn, principally producing publicly available material to which Plaintiffs already had access. By May 7, 2024, Argentina had produced only 925 documents, flatly refused to produce discovery related to its alter-ego relationships with state-owned entities, and continued to deny Plaintiffs information concerning various Argentine financial accounts. *See* PSA.41.

On May 28, 2024, the court ordered Argentina to produce information concerning its relationship with YPF and BCRA, concluding that there was reason to think that these entities may be alter egos. JA.363. The Court also granted Plaintiffs leave to demonstrate that similar discovery was warranted as to other state-owned entities. *Id.* Argentina objected, arguing that a few federal courts had already concluded that those four entities were not Argentina's alter egos. But the district court rejected that argument, pointing out that the decisions that Argentina cited were a decade or more old, and that Plaintiffs properly sought discovery to determine

14

whether the target entities are Argentina's alter egos *today* based on current information.  JA.361-63.

Argentina continued to engage in its strategy of obfuscation and delay.  After nine months and nineteen meet-and-confers, it had produced only 3,530 documents, none of which included any off-channel communications.  PSA.46.  Plaintiffs were thus forced, again, to seek intervention from the district court, which ordered Argentina to submit periodic progress reports regarding its productions.  PSA.69-70.

**E.    The District Court Grants Discovery of Off-Channel Communications.**

Plaintiffs asked Argentina to produce not only its public officials' communications through official channels regarding Argentina's relationship with the relevant state-owned enterprises, but also so-called "off-channel" communications—i.e., communications by public officials concerning official business that those officials sent or received on non-official platforms such as WhatsApp, Gmail, and Signal.  *See* SA.52-53.  In support of that request, Plaintiffs submitted extensive evidence showing that Argentine public officials routinely use off-channel communications to conduct official business.  *See* SA.53; JA.1311-18. Plaintiffs' submission included evidence that 93% of the Argentine public uses private messaging platforms to communicate, and numerous reports that Argentine officials, including President Javier Milei, Chief of Staff Nicolas Posse, and Minister of Economy Luis Caputo communicate about official business through off-channel

communications, including WhatsApp. JA.1299-300, 1311-18. Plaintiffs also submitted an expert report explaining that Argentina had the practical and legal ability to collect and produce these communications without violating Argentine law. PSA.88-100. Argentina did not (and does not) deny that its public officials use private messaging platforms and email accounts for government business, and submitted no evidence showing that Argentine officials in general, or any specific individuals in particular, do not use off-channel communications for official business. PSA.137, 140; JA.1298; JA.1521, 1528, 1532, 1535. Unsurprisingly, the district court concluded that there was clearly relevant government business being conducted through off-channel communications. PSA.136-38.

On July 29, 2025, the district court held a lengthy hearing at which it permitted Plaintiffs to seek discovery of off-channel communications by certain Argentine officials regarding certain state-owned enterprises that Plaintiffs assert are potential alter egos of Argentina. In light of "the small size of the productions of official communications so far" by Argentina, and the "evidence that [Argentine] officials use off-channel communications, like WhatsApp, for official communications," the court found that it "seems obvious that these officials are conducting official business on their personal accounts." SA.53. And to the extent that Argentina claimed Argentine law posed any obstacle to that discovery, the court concluded that the significant interest of the United States in enforcing a valid and unstayed final

16

judgment meant that international comity "weighs in favor of collecting and reviewing off-channel communications to help plaintiffs determine whether the state-owned entities are alter egos" such that their assets might be available to satisfy the judgment. SA.53; *see* SA.50 (recognizing that "[t]he United States has a substantial interest in fully and fairly adjudicating matters before the Court," and that "[d]enying Plaintiffs the discovery at issue here would lead to unfairness because it would impact Plaintiffs' ability to recover on [their] $16 billion unpaid judgment"). The district court proceeded to review in detail Plaintiffs' preliminary showing with respect to each Argentine official and state-owned enterprise as to which Plaintiffs sought discovery, and granted discovery only where Plaintiffs showed it was likely that the official's off-channel communications would include relevant information and that there was reason to believe the state-owned enterprise was a potential alter ego (finding that standard met as to YPF, BCRA, BNA, ENARSA, and Aerolíneas, but not ARSAT). *See* SA.55-66. Notably, the district court explicitly found that Minister of Economy Luis Caputo's off-channel communications were relevant to the alter-ego issues before the court, noting his involvement in Argentina's relationship with BCRA and YPF. JA.1381.

Argentina moved for reconsideration, which Plaintiffs opposed, submitting additional evidence that Argentine officials regularly conduct official business relating to state-owned enterprises through off-channel communications—including

17

a news interview in which President Javier Milei, Minister of Economy Luis Caputo, and BCRA Governor Santiago Bausili told an interviewer that they are in constant contact through a private chat group, and that Minister of Economy Luis Caputo was BCRA Governor Santiago Bausili's boss ("jefe"). JA.1398-1401; PSA.150-51, 154-56.

The district court denied Argentina's motion for reconsideration. SA.73. As the court explained, whether Argentina could be required to produce the requested off-channel communications "turns on whether [Argentina] has 'control' over the communications," meaning whether Argentina has the "practical ability to obtain the documents." SA.75-77. On that key question, the court concluded that even "[a]ssuming, without deciding, that Argentine law applies," Argentina did have the practical ability to obtain the off-channel communications at issue. SA.83. In particular, the court concluded, "off-channel communications concerning official business constitute 'public information' under Argentine law, such that [Argentina] can request the communications from the officials." SA.83. In addition, the court concluded that Argentina—"a sovereign nation that emphasizes its desire to cooperate with this post-judgment litigation"—also had "the 'practical ability' to receive the communications through other legal avenues," including "request[ing] the consent of the individual officials" or seeking an order from the Argentine courts requiring disclosure. SA.83-84.

18

### F.     The Discovery Process Remains Ongoing.

Argentina filed a notice of appeal from the district court's discovery order and order denying reconsideration, initiating this appeal, but it did not seek a stay of those orders pending appeal (nor would it have had any basis to do so).  Instead, Argentina represented to the district court that it was "considering what steps it c[ould] take, consistent with Argentine law, to comply," and that it needed to conduct a "detailed analysis of Argentine law" to decide.  JA.1430.

In September 2025, Argentina informed Plaintiffs that it would not comply with the district court's order—and in particular, that it would not even ask its public officials to consent to provide their off-channel communications concerning official government business for disclosure in discovery.  JA.1451.  According to Argentina, it could not ask its public officials for their consent to provide those off-channel communications, because doing so "would amount to coercing individuals to waive their privacy rights," and also "interfere with individual property rights under Argentine law."  JA.1454, 1473.

A month later, Argentina abandoned that unlikely position, declaring that on further reflection it *could* at least ask its public officials to consent to turn over off-channel communications regarding official government business that they had made or received through non-official platforms.  JA.1567.  Argentina subsequently notified Plaintiffs that "nearly all of the officials from the current administration

19

from whom [Argentina] has received a response have voluntarily agreed to provide their [off-channel] communications." Arg.Br.20; *see* JA.1672.

Argentina has now confirmed that it can obtain, and will produce, off-channel communications for at least 16 officials, and has begun making productions. PSA.158-59. On December 9, 2025, the district court ordered production of these officials' communications by January 10, 2026. PSA.157-58. Argentina is still deciding whether it will produce off-channel communications for another 14 officials, leaving only six officials as to whom Argentina currently claims (as of the filing of this brief) that it lacks the practical ability to obtain their off-channel communications.

To date, Argentina has produced approximately 240 pages of WhatsApp communications exchanged with potential alter-ego entities for 7 of the 36 officials whose communications Plaintiffs had requested. PSA.157. Even that minimal production confirmed that Argentine officials routinely use off-channel communications for official business, including to communicate with the potential alter-ego entities at issue here. In one WhatsApp group chat, for instance, a former Argentine undersecretary, a host of other Argentine officials, and four ENARSA directors discuss government business. PSA.157-58. In another WhatsApp group chat, Argentine officials, a director of YPF, and a director of ENARSA even exchange relevant documents. PSA.158. Additional productions—whose contents

20

Plaintiffs cannot yet know—are scheduled to occur in the upcoming month, with possible additional productions to follow. Despite its demonstrated practical ability to obtain and produce those off-channel communications, however, Argentina continues to refuse to produce off-channel communications from six public officials who have refused to voluntarily provide those communications, including its Minister of Economy Luis Caputo. PSA.158. And notwithstanding Plaintiffs' repeated requests for clarification and a colloquy on the subject with the district court, Argentina has still failed to confirm the steps it has taken to preserve off-channel communications. JA.1457-58, 1464-65, 1594-96, 1599, 1649-51.

## SUMMARY OF ARGUMENT

This appeal is jurisdictionally barred and meritless. This Court lacks jurisdiction to review the interlocutory discovery order that Argentina challenges, and its objections to that order are mistaken in any event. The Court should dismiss the appeal for lack of jurisdiction or affirm.

The first problem with this appeal is the absence of appellate jurisdiction, which is dispositive. Argentina does not dispute that the district court's order is an interlocutory discovery ruling, or the settled rule that such orders typically are not appealable. It asserts instead that this Court should find that the collateral-order doctrine creates an exception to that typical rule here. But the district court's order does not conclusively determine the relevant issues—as shown by the fact that the

21

parties continue to dispute in district court the proper scope of discovery with respect to off-channel communications and Argentina continues to make document productions—and its ruling is not effectively unreviewable on appeal, as Argentina can seek review either by waiting until the district court enters final judgment on the collection proceedings, or by refusing to follow the district court's order and appealing the resulting contempt sanctions. The collateral-order doctrine therefore does not apply, and Argentina's appeal must be dismissed for lack of jurisdiction.

The second problem with this appeal is that it is meritless. As its lead argument, Argentina contends that it has no right, authority, or practical ability to obtain its public officials' off-channel communications relating to their official duties as members of the Argentine government. Yet since the filing of this appeal, Argentina has already reversed course and started reviewing and producing off-channel communications from 16 of the 36 officials at issue, and it is still deciding whether it will produce from 14 more. In any event, the argument that an organization can shirk its discovery obligations because it cannot access its employees' off-channel communications is frivolous. Like any other employer, Argentina has the practical ability to obtain the work-related communications of the officials who work for it, even when those officials have chosen to send and receive their work-related communications through unofficial platforms rather than official government channels. Argentina cites nothing in Argentine law that would prevent

22

it from asking its officials to produce any work-related communications in their possession (as it concedes it is already doing), or to insist on compliance with that request by imposing discipline up to and including termination on any officials who refuse to comply—which, of course, is precisely what Argentina would do if it wanted to obtain those off-channel communications itself. Given that reality and the recent and forthcoming productions, there can be no reasonable dispute that Argentina has the practical ability to obtain the requested off-channel government communications regarding Argentina's state-owned enterprises from its public officials. Simply put, Argentina has the practical ability to ensure compliance, and lacks only the desire to ensure compliance. And even if Argentina lacked that practical ability, the district court correctly determined that Argentina has the legal right and authority to insist on production of those communications as public documents under Argentine law. Argentina cannot show that either of those rulings was an abuse of the district court's discretion, let alone both.

Argentina's alternative argument that the district court abused its discretion in finding the requested discovery relevant and proportional is equally meritless. The Federal Rules provide for broad post-judgment discovery, and the district court has broad discretion to manage the discovery process and balance the need to ensure that litigants have full access to relevant information with the potential burdens of production. Argentina does not attempt to challenge any of the district court's

specific findings with respect to each Argentine official and each state-owned enterprise as to which it permitted discovery. Instead, Argentina claims that discovery into its potential alter-ego relationship with its state-owned enterprises is categorically irrelevant as a matter of law, because (according to Argentina) it cannot possibly lead to any executable assets. But as the Supreme Court and this Court have made clear (in other cases involving Argentina itself), judgment creditors are not required to take Argentina's word on what discovery may or may not lead to assets that might be available to satisfy an outstanding judgment against it. The district court did not abuse its discretion in concluding that the cabined discovery that it permitted into off-channel communications by specific Argentine officials with respect to the Argentine government's relationship with specific state-owned entities was relevant and proportional to the needs of this case. If this Court does not dismiss the appeal for lack of jurisdiction, it should affirm.

## STANDARD OF REVIEW

This Court determines in the first instance whether a challenged order is appealable. *See, e.g.*, *Lora v. O'Heaney*, 602 F.3d 106, 111 (2d Cir. 2010). The Court reviews a post-judgment discovery order for abuse of discretion, in light of the district court's "broad latitude to determine the scope of discovery and to manage the discovery process." *EM Ltd. v. Republic of Argentina*, 695 F.3d 201, 207 (2d Cir. 2012).

24

## ARGUMENT

### I.  This Court Lacks Jurisdiction To Review The District Court's Discovery Order.

Argentina's challenge to the district court's discovery order—which requires it to produce communications by its public officials concerning official business— is wholly meritless. *See infra* pp.34-54.  But this Court need not (and cannot) consider that challenge in any event, because the district court's interlocutory discovery ruling is not a final and appealable order.  Argentina's appeal should therefore be dismissed for lack of jurisdiction.

As both this Court and the Supreme Court have long recognized, discovery rulings are classic non-appealable orders.  *See, e.g.*, *Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100, 108 (2009) ("The rule remains settled that most discovery rulings are not final." (brackets omitted) (quoting 15B Federal Practice & Procedure §3914.23 (2d ed. 1992)); *In re Air Crash at Belle Harbor*, 490 F.3d 99, 104 (2d Cir. 2007) (discovery order "is generally not a 'final decision' and therefore is not immediately appealable").  There is no different rule for a discovery order necessitated by a defendant's unwillingness to satisfy an unstayed monetary judgment.  A discovery order that is "part of post-judgment litigation warrants no different conclusion," as the "final decision" in that context is "the subsequent judgment that concludes the collection proceedings." *Vera v. Republic of Cuba*, 802 F.3d 242, 247 (2d Cir. 2015).  As a result, appellate review of a post-judgment

25

discovery order "is generally unavailable until the collection proceedings terminate, at which point the order will merge into the final judgment effecting *that* termination"—unless, of course, the party resisting the order chooses to defy it and then appeal any subsequent contempt sanctions. *Vera*, 802 F.3d at 247; *see, e.g.*, 15B Federal Practice & Procedure §3916 (3d ed. 2025) (post-judgment "orders granting discovery are not appealable" as long as "review is available by way of disobedience and contempt"); *id.* §3914.23 ("[O]rders granting discovery in aid of execution have been held nonappealable on the familiar ground that review can be had through contempt proceedings."); *see also Mohawk*, 558 U.S. at 111 (noting the "long-recognized option" that a party may "defy a disclosure order and incur court-imposed sanctions," at which point the party "can then appeal directly from that ruling").

Argentina does not contest that the discovery order here was interlocutory, or that such orders are generally unappealable even in the post-judgment context. Instead—in a two-and-a-half-page jurisdictional statement, *see* Arg.Br.4-7—it argues that the particular discovery order here is immediately appealable under the collateral order doctrine. That is untenable. The collateral order doctrine is a narrow exception for extraordinary circumstances, and discovery disputes, even in the post-judgment context, are as routine as rulings get. Like most discovery disputes, the underlying issues here involve an ongoing controversy between the parties that the

district court is continuing to supervise below, including addressing any further changes in Argentina's position. And if Argentina ultimately refuses to comply with the court's order with respect to one or more of its officials, the district court will receive further briefing and argument and make factual findings as to whether Argentina has shown that it was in fact unable to obtain the specific communications at issue despite its best efforts, such that contempt sanctions would be inappropriate. The collateral-order doctrine does not and should not permit Argentina to short-circuit that process.

"For the collateral-order doctrine to apply, the challenged order must: (1) conclusively determine the disputed question; (2) resolve an important issue completely separate from the merits of the underlying action; and (3) be effectively unreviewable from a final judgment." *Lora*, 602 F.3d at 111. Those conditions "are stringent," to ensure that "the class of collateral orders as to which interlocutory review is permitted" will remain "narrow and selective in its membership." *Linde v. Arab Bank, PLC*, 706 F.3d 92, 103 (2d Cir. 2013); *see Will v. Hallock*, 546 U.S. 345, 349-50 (2006). "Failure to meet any of these three elements is fatal." *Lora*, 602 F.3d at 111.

Argentina cannot satisfy either the first or the third element here. As to the first, the district court's challenged order does not "conclusively determine the disputed question" of what off-channel communications Plaintiffs are entitled to

27

obtain in discovery. *Id.* On the contrary, it simply overrules several of Argentina's manifold objections to producing those communications, including by concluding that Argentina cannot categorically assert that it lacks control over those communications simply because its public officials made or received those communications on WhatsApp group chats rather than through official channels. *See* SA.52-53, SA.82-84.

The subsequent history of this litigation proves the point, underscoring that Argentina is seeking appellate intervention in the midst of an evolving discovery dispute. Since the district court entered its discovery order, Argentina has cycled through a constantly changing array of positions, first claiming that it needed to conduct a "detailed analysis of Argentine law" to determine what steps it could take to comply, JA.1430, 1588-91; then asserting it could not request its officials' cooperation because doing so would be coercive, JA.1455, 1473, 1605-06; and later reversing course and requesting its officials' cooperation, JA.1648. That evolution has continued even after Argentina filed this appeal: In the parties' December 2025 update to the district court, Argentina reported that it has now secured "consent" from 16 of its officials and has started producing their off-channel communications, with production continuing on a rolling basis. PSA.157-58. On December 9, 2025, the district court ordered that Argentina complete its production as to those 16 officials by no later than January 10, 2026. Argentina is still deciding whether to

28

produce off-channel communications for another 14 officials, meaning that there may be many more productions to come.

Argentina is currently refusing to produce off-channel communications for only six of its officials, and the district court and the parties are still in the midst of determining how the discovery process should proceed in light of that refusal. In particular, the district court has directed the parties to confer on a briefing schedule for Plaintiffs' forthcoming motion for contempt and sanctions, which will allow the district court to make additional factual findings on these issues and rule on whether Argentina has failed to comply with the court's orders. And needless to say, if the district court determines that the ongoing production demonstrates that the discovery Plaintiffs have requested is irrelevant or unduly burdensome—as Argentina asks this Court to decide in the first instance, *see* Arg.Br.38-45—the district court is free to revisit the scope of its discovery order. That ongoing and constantly developing discovery process is precisely the kind of scenario in which "the district court's central role in managing ongoing litigation" should not be disrupted by "the inefficiencies that would be created by permitting a court of appeals to review issues before the district court has had an opportunity to address all of the case's often interrelated questions." *Linde*, 706 F.3d at 103.

Argentina claims that the district court's order represents a "final determination" that Argentina "has control over the personal devices and accounts

29

of its current and former officials." Arg.Br.6. Of course, that argument extends only to the first issue that Argentina presents on appeal; even Argentina does not claim that the district court's order "conclusively determine[s]" whether the requested discovery is relevant or unduly burdensome. *Lora*, 602 F.3d at 111. More to the point, Argentina's framing applies the "final determination" requirement far too narrowly. Practically any interlocutory order could be described as a conclusive determination on the specific question or sub-question before the court; a summary judgment order, for instance, conclusively determines whether summary judgment should be granted. The district court's order here conclusively (and correctly) rejects Argentina's assertion that it lacks control over communications by its public officials regarding official business, but does not conclusively resolve the full scope of what communications Argentina must produce, an issue that will necessarily "invite or require continuing consideration." 15A Federal Practice & Procedure §3911.1. Appellate review of the district court's discovery order is therefore barred by the first element of the collateral-order doctrine.

This appeal is also barred by the third element, because the district court's discovery order is not effectively unreviewable on appeal from a subsequent final judgment (here, the "subsequent judgment that concludes the collection proceedings," *Vera*, 802 F.3d at 247). As the Supreme Court has held, even a discovery order that requires disclosure of materials covered by the attorney-client

privilege can be adequately vindicated by a post-judgment appeal. *Mohawk*, 558 U.S. at 109-10. That is no less true of Argentina's challenge to the district court's discovery order here.

And like other litigants facing unappealable interlocutory orders, Argentina has "several potential avenues of review apart from collateral order appeal." *Id.* First, if it believes the district court's order presents a novel and controlling question of law and that appellate review may materially advance the termination of the litigation, it can seek certification for interlocutory review under 28 U.S.C. §1292(b). But those standards are rigorous and requires the assent of both the district court and this Court before appellate resources are committed. By contrast, as this purported appeal aptly demonstrates, Argentina's misguided view of the collateral order doctrine would give it the unilateral ability to seek appellate review as of right over perceived abuses of discretion that would never satisfy the standards imposed by §1292(b). Second, if Argentina believes that the district court's order presents the kind of rare and exceptional circumstances "amounting to a judicial usurpation of power or a clear abuse of discretion," it can seek mandamus. *Cheney v. U.S. Dist. Ct.*, 542 U.S. 367, 380 (2004) (citation omitted). That route preserves this Court's gate-keeping role, and prevents parties from pursuing interlocutory appeals based on their own perceptions of the importance of the matter or egregiousness of the judicial actions. Finally, and most obviously, if Argentina believes the district court's order

31

is simply wrong, it can exercise the "long-recognized option" to simply "defy [the] disclosure order and incur court-imposed sanctions," and then "appeal directly from that ruling." *Mohawk*, 558 U.S. at 111-12. Especially in light of those alternative avenues for appellate review, there is no good reason for this Court to depart from the settled general rule that discovery orders are not immediately appealable.

Argentina's contrary arguments are wholly unpersuasive. It begins by attempting to invent a special carve-out under the collateral-order doctrine, claiming that post-judgment discovery orders are "typically appealable under the collateral-order doctrine" if they "compel[] discovery of a foreign sovereign's foreign assets." Arg.Br.5. But neither of the two cases that Argentina cites actually stands for that proposition, or supports finding the district court's interlocutory discovery order appealable here. In *EM*, for instance, this Court found that a different discovery order involving Argentina was not effectively reviewable on appeal because it was directed at a third party rather than Argentina itself, and so Argentina could not "obtain review through disobedience and contempt." 695 F.3d at 206. And in *Aurelius*, this Court recognized that the collateral-order doctrine may apply to orders that "present issues of sovereign immunity … or treaty interpretation"—neither of which is at issue here, especially in light of this Court's previous decision denying Argentina's claim of sovereign immunity. *Aurelius Cap. Master, Ltd. v. Republic of Argentina*, 589 F.App'x 16, 16-17 (2d Cir. 2014); *see Petersen*, 895 F.3d at 205-09.

32

In short, no decision from this Court (or any other) creates a general exception to §1291 giving foreign sovereigns a right to automatically appeal adverse discovery orders.[2]

Argentina contends next that complying with the order "would risk serious … liability" for Argentina in its home courts, "which U.S. courts cannot undo." Arg.Br.6. But as the district court explained, and as addressed in more detail below, the order is fully consistent with Argentine law. SA.78-84; *see infra* pp.34-44. In any event, if Argentina believes it cannot comply with both the district court's order and Argentine law, it is free to defy the district court's order and seek immediate appeal from any resulting sanctions. *Mohawk*, 558 U.S. at 111. It cannot, however, appeal the district court's non-appealable interlocutory discovery order, which neither conclusively resolves the disputed issue nor is effectively unreviewable on appeal. This Court should accordingly dismiss the appeal for lack of jurisdiction.

---

[2] Argentina's alternative attempt to create that exception by asserting a "risk of sanctions" and "ensuing international conflict" if it refuses to comply with the district court's order is equally meritless. *Contra* Arg.Br.6. If Argentina refuses to comply with the district court's order and is sanctioned, it will be able to appeal the sanctions order at that time. *See Mohawk*, 558 U.S. at 111. And while a court would not lightly hold a foreign sovereign in contempt, when litigation ensues precisely because one of the FSIA exceptions is applicable, the foreign sovereign cannot behave as if it has some residual immunity from the court's contempt power.

33

**II.** **The District Court Did Not Abuse Its Discretion In Determining That Argentina Has Control Over Its Officials' Off-Channel Communications.**

Even if the district court's discovery order were appealable, Argentina's challenge would fail, because that order was plainly correct. The district court did not err—let alone abuse its discretion—in concluding that Argentina has control over its public officials' off-channel communications concerning official business.

**A.** **The District Court Properly Determined That Argentina Has the Practical Ability to Obtain the Off-Channel Communications.**

The governing legal standard is undisputed. Under Rule 34, a party may seek discovery of documents in the other party's "possession, custody, or control." Fed. R. Civ. P. 34(a)(1). And as this Court has explained, "documents are considered to be under a party's control when that party has the right, authority, or practical ability to obtain the documents." *Mirlis v. Greer*, 80 F.4th 377, 382 (2d Cir. 2023). In other words, if a party has "the practical ability to possess documents," then production of those documents "may be required." *Shcherbakovskiy v. Da Capo Al Fine, Ltd.*, 490 F.3d 130, 138 (2d Cir. 2007). The district court was plainly correct, and certainly did not abuse its discretion, in concluding that Argentina has the practical ability to obtain its public officials' off-channel communications regarding official business, as its ongoing production of those communications amply demonstrates. SA.82-84.

1. That conclusion goes almost without saying. As numerous courts have held, for purposes of Rule 34, "employers have control over their employees and can

be required to produce documents in their employees' possession." *Chevron Corp. v. Salazar*, 275 F.R.D. 437, 449 (S.D.N.Y. 2011) (citing cases); *see, e.g.*, *Smith v. Pergola 36 LLC*, 2022 WL 17832506, at *4 (S.D.N.Y. Dec. 21, 2022) (requiring the defendant to produce "responsive electronic communications that reside on the personal devices of its current employees"); *Miniace v. Pac. Mar. Ass'n*, 2006 WL 335389, at *2 (N.D. Cal. Feb. 13, 2006) ("Numerous courts have found that corporations have control over their officers and employees and that corporations may be required to produce documents in their possession."). The same rule extends to former employees, at least where the employer has a "continuing connection" to those employees. 8B Federal Practice & Procedure §2210.

Argentina's relationship with its public officials is thus more than sufficient to conclude that Argentina has the practical ability to obtain those officials' off-channel communications relating to official business. After all, Argentina surely does not believe that if its Minister of Economy were to go rogue and start independently negotiating with foreign nations or conducting other official business through off-channel communications, the Argentine Government would have no ability to insist that he turn over whatever communications relating to official business he might have sent or received through those channels—and if the Minister of Economy refused to provide those communications, to terminate him from his position. If Argentina can exercise that control over its public officials in service of

its own interests, it can likewise exercise that control in service of a discovery request under Rule 34.

Argentina has no meaningful response. It concedes that courts "often find that an employer controls documents held by its employee because a U.S. employer typically can discharge the individual if he or she fails to cooperate in discovery." Arg.Br.28 (citing multiple cases). According to Argentina, however, "that is not the case under Argentine law"; instead, Argentina says, "multiple provisions of Argentine constitutional and criminal law prevent [Argentina] from accessing— much less controlling—communications on personal accounts and devices." Arg.Br.28, 30. But even by Argentina's own description, the provisions of Argentine law that Argentina cites—such as the "right to [one's] property" and "right to privacy," Arg.Br.30—say nothing of the sort.

According to Argentina, the Argentine laws that it cites prohibit it from "simply tak[ing] possession" of its officials' property, and make it a crime for Argentina to "seize [those officials'] personal devices and accounts." Arg.Br.30-31. It is not clear why Argentina thinks any seizure of private property would be required here, since off-channel communications by public officials relating to official business are neither property nor private. *See* JA.458, JA.464-65; *infra* pp.41-44. In any event, Argentina cites nothing to suggest that it would violate Argentine law for Argentina to direct its public officials to produce any communications relating to

36

official business that are in their possession—and to make clear that if they refuse to comply with that request, they will no longer be permitted to serve in their official positions. That approach involves none of the forcible seizure of private property that Argentina says its law prohibits. And Argentina's ability to take that approach— which is presumably what the Argentine government would do if it actually *wanted* to obtain the rest of its public officials' off-channel communications—makes clear that Argentina does in fact have the "practical ability" to obtain the communications at issue. *Mirlis*, 80 F.4th at 382.[3]

Argentina likes to suggest that the United States would not allow comparable intrusions if the shoe were on the other foot. That argument rings hollow in general, because the United States does not go to foreign stock exchanges to raise capital or make extraordinary and extraordinarily clear promises to foreign investors. But in suggesting it can shirk discovery requests because its officials' personal email accounts lie beyond its effective control, Argentina attempts to go where governmental entities in this country cannot.

---

[3] Of course, if Argentina takes those steps, and its public officials *still* refuse to produce their off-channel communications even though it results in termination from their official positions—an extraordinarily unlikely scenario—Argentina would have a strong argument at that point that it should not face sanctions for its inability to comply with the district court's order. *See Shcherbakovskiy*, 490 F.3d at 138 (party should not face sanctions for failing to produce documents it "cannot obtain").

The law Argentina invokes is no different from the law here. Like Argentina's description of Argentine law, federal law prohibits the federal government from simply seizing and searching its employees' devices as a matter of sovereign law enforcement. *See* U.S. Const. amend. 4. But no one would dispute that the federal government has the practical ability to require its officers and employees to produce off-channel communications relating to their official functions, including by terminating them if they refuse to do so. *Cf. Garcetti v. Ceballos*, 547 U.S. 410, 421-25 (2006) (government may discipline employees for speech "made pursuant to official responsibilities"). Indeed, under appropriate circumstances, the "off-channel" communications of government officials can constitute state action. *See, e.g.*, *Lindke v. Freed*, 601 U.S. 187 (2024). Governments in this country could not shield such state action from judicial inquiry or foreclose discovery into the nature of the "off-channel" communications on the spurious grounds that there are some restrictions on using sovereign powers to obtain comparable information from citizens who are not government officials or government employees. For the same reason, the district court did not abuse its discretion in concluding that Argentina has the practical ability to obtain its public officials' off-channel communications relating to their official business.[4]

---

[4] Notably, Argentina does not dispute that it has the practical ability to request consent to produce off-channel communications from its officials; on the contrary,

2. In addition to "request[ing] the consent of the individual officials," the district court also suggested two other avenues through which Argentina could obtain its public officials' off-channel communications relating to official business: by "amend[ing] the law by statute" to the extent Argentine law does not already require public officials to disclose off-channel communications relating to official business, or by seeking a judicial order requiring disclosure "through the Argentine courts." SA.83-84. While neither of those avenues is necessary to conclude that Argentina has the practical ability to obtain the communications at issue, Argentina's objections to both avenues are misguided.

First, Argentina contends that a district court cannot require it to "enact or change a law." Arg.Br.35. But the district court's order does not require Argentina to change any law; it simply observes that, as "a sovereign nation that emphasizes its desire to cooperate with this post-judgment litigation," Argentina has the ability to do so. SA.83. In any event, no change in Argentine law is needed, as Argentine law already requires disclosure of "public information" like the off-channel communications here. SA.83; *see infra* pp.41-44.

---

Argentina admits it "already has sought cooperation from each custodian, and is in the process of collecting relevant communications from the individuals who have agreed to cooperate." Arg.Br.34; *see supra* pp.19-21. Argentina cites no law depriving it of the practical ability to encourage its public officials to cooperate, including by removing officials who refuse to do so.

Second, Argentina deems it "difficult to understand" how it could obtain a judicial order from the Argentine courts requiring its public officials to produce their off-channel communications concerning their official activities, and claims that any such order would be possible only in the context of a criminal proceeding. Arg.Br.36. That argument simply ignores the record below, where "[t]he parties' experts agree[d] that an Argentine court can order [Argentina] to access the communications." SA.84 (citing JA.420-21 (Argentina's expert asserting that Argentina cannot access its officials' "private communications" absent "a court order from an Argentine court authorizing it"); JA.462-63 (Plaintiffs' expert agreeing that Argentina "can collect and produce communications on its officials' personal devices and accounts pursuant to a court order")). And while Argentina's expert was "not aware" of any law outside the criminal context that would make such communications discoverable, JA.423, Plaintiffs' expert pointed to two, including Law 27,275 itself, *see* JA.462. The district court did not abuse its discretion by finding Plaintiffs' expert more persuasive.

Argentina also asserts that the "appropriate procedure" for seeking discovery from Argentina's own public officials is "through letters rogatory to an Argentine court under the Hague Convention." Arg.Br.36. But as the Supreme Court has made clear, "the Hague Convention's procedures are not mandatory," and litigants are not required to "resort to those procedures before initiating any discovery pursuant to

40

the normal methods of the Federal Rules of Civil Procedure." *Société Nationale Industrielle Aerospatiale v. U.S. Dist. Ct.*, 482 U.S. 522, 541-42 (1987). Where, as here, the documents at issue are in the control of the other party, a litigant is not required to rely on the "unduly time consuming and expensive" process required by the Hague Convention rather than the straightforward procedures of Rule 34. *Id.* at 542-43.

**B.    The District Court Properly Determined That Argentina Has the Right and Authority to Obtain the Off-Channel Communications.**

Because Argentina has the practical ability to obtain its public officials' off-channel communications regarding official business, this Court can affirm without deciding whether Argentina also has the "right" and "authority" to demand those off-channel communications as "public information" under Argentine law. *See* Arg.Br.31-34. But if this Court were inclined to address that question, it should affirm the district court's determination on that point as well.

As the district court explained, Argentine law defines "public information" to include "documents of any format" that government entities "generate, obtain, transform, control, or hold," regardless of the type of device or account on which those documents are generated or held. SA.79 (quoting Law No. 27,275). And in interpreting that definition, courts must "always favor the broadest effectiveness and scope of the right to information." SA.79 (same). Argentine law also recognizes that public information sweeps in data "closely related to the sphere of activity of

41

government officials," including "emails of public officials, sent and/or received in the course of their duties," even when not "sent through official mailboxes." SA.80 (emphasis omitted) (quoting Decree No. 206/2017 and Resolution 237/2021). As a result, as the district court correctly recognized, off-channel communications by Argentine public officials concerning official business "constitute 'public information' under Argentine law," and so public officials cannot withhold those communications from public disclosure—let alone from the Argentine government itself. SA.83; *see* SA.78 (recognizing that "[i]f the communications are 'public documents,' by collecting them [Argentina] would not violate the other laws that the parties mention").

Again, Argentina has no convincing response. It argues first that even if its public officials' off-channel communications regarding official business are "public information" under Argentine law, it still has no right to require its public officials to turn over that public information. Arg.Br.32. That is, according to Argentina, public officials in Argentina are not subject to the Argentine "analogue to the U.S. Freedom of Information Act (FOIA)" as long as they keep any communications about official business that they would prefer not to disclose on their off-channel WhatsApp and Signal group chats rather than sending them through official communications channels. Arg.Br.32; *see* Arg.Br.34. The district court did not abuse its discretion by rejecting that bizarre interpretation of Argentine law, which

42

has no basis in the statutes that Argentina cites.  On the contrary, Argentina concedes that even "members of the public" have the right under Argentine law to access "emails and internal documents created or exchanged between Argentine government officials" on "devices under the possession, control or custody of the national government."  Arg.Br.32 (emphasis omitted) (quoting JA.414).  For the reasons already explained, off-channel communications regarding official business in the hands of Argentine public officials are within the "control" of the national government.  *See supra* pp.34-39.

Alternatively, Argentina contends that off-channel communications by its public officials concerning official matters are not "public information" under Argentine law at all.  Arg.Br.33.  That "sounds absurd, because it is."  *Sekhar v. United States*, 570 U.S. 729, 738 (2013).  The possibility that *some* off-channel communications by public officials might involve "preparatory deliberations" or "information that is in the private sphere of the official," and so not qualify as "public information," Arg.Br.33, does not create a wholesale exclusion from disclosure for *all* off-channel communications by Argentine public officials regarding public matters, much less demonstrate that Argentina has no right or authority to obtain those communications.  If there are specific communications that Plaintiffs have requested but Argentina cannot obtain because they are "preparatory deliberations" or information "in the private sphere," Arg.Br.33, that is a matter for Argentina to

43

take up with the district court on a case-by-case basis, not a reason to deny Plaintiffs any discovery at all into key Argentine officials' off-channel communications regarding Argentina's state-owned enterprises.[5]   Moreover, Argentina's purported concern about potential disclosure of sensitive government information only undermines its claim of lack of practical control, since Argentina plainly would not allow sensitive government information to be placed on systems that it has no practical ability to access or control.

### III.   The District Court Did Not Abuse Its Discretion In Finding The Requested Discovery Relevant And Proportional.

Argentina fares no better in its argument that any discovery into its public officials' off-channel communications regarding its state-owned enterprises is neither relevant nor proportional to the needs of the case.  At the point that Argentina is arguing that the district court abused its discretion on questions of relevance and proportionality, the flaws with this asserted appeal as of right are in sharp relief.  In all events, the district court did not remotely abuse its discretion in determining that the discovery that Plaintiffs have requested is relevant to their ongoing efforts to execute on their unstayed (and unsatisfied) judgment, and that it is not unduly

---

[5] Argentina asserts that Plaintiffs "could submit a simple administrative request" for any public information in its public officials' off-channel communications, Arg.Br.33, but Plaintiffs are not Argentine citizens entitled to invoke Law 27,275. In any event, Argentina cites no law that would require Plaintiffs to rely on the Argentine equivalent of a FOIA request rather than the discovery procedures of the Federal Rules.

burdensome. If this Court concludes it has jurisdiction to review that interlocutory discovery order at all, it should affirm.

### A. The District Court Properly Determined That the Requested Discovery Is Relevant.

The Federal Rules of Civil Procedure permit discovery "regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). That standard is far-reaching, and "has been construed broadly to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case." *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978). In the post-judgment context, a judgment creditor "is entitled to discover the identity and location of any of the judgment debtor's assets, wherever located." *First City, Tex. Hou., N.A. v. Rafidain Bank*, 281 F.3d 48, 54 (2d Cir. 2002). To that end, the judgment creditor "must be given the freedom to make a broad inquiry to discover hidden or concealed assets of the judgment debtor." *Id.*; *see, e.g.*, *First Tech. Cap., Inc. v. Airborne, Inc.*, 380 F.Supp.3d 217, 219-20 (W.D.N.Y. 2019) (similar). "Determinations of relevance are entrusted to the sound discretion of the district court, and [this Court] will not override its decision unless arbitrary or irrational." *United States v. Rubin*, 37 F.3d 49, 52 (2d Cir. 1994); *see United States v. Abu–Jihaad*, 630 F.3d 102, 131 (2d Cir. 2010) (recognizing the district court's "superior position to assess relevancy").

45

The district court properly exercised its sound discretion in finding that the requested discovery into Argentine officials' off-channel communications regarding Argentina's potential alter egos was relevant here. As the court explained, the "small size of the production[] of official communications" by Argentina "demonstrates that the communications are likely elsewhere," and Plaintiffs had presented substantial evidence that Argentine officials "use off-channel communications, like WhatsApp, for official communications." SA.53. As such, "it seems obvious that [Argentine] officials are conducting official business on their personal accounts," and so the requested off-channel communications were relevant "to help [P]laintiffs determine whether the state-owned entities are alter egos." SA.53. The court also reviewed each of the Argentine officials and state-owned enterprises as to which Plaintiffs sought discovery, and granted discovery only for those as to which it found Plaintiffs had made a sufficient threshold showing that the officials were likely to have relevant communications and that there was reason to believe the state-owned enterprise was Argentina's alter ego. SA.55-66.

As to most of its officials, Argentina did not dispute that their off-channel communications regarding their official business were relevant for discovery purposes. As to the few remaining officials for whom Argentina did dispute the relevance of their off-channel communications, the court made specific and detailed factual findings explaining why Plaintiffs had (or had not) carried their burden to

46

show that discovery from those officials was (or was not) warranted. For instance, as to Minister of Economy Luis Caputo, whose off-channel communications Argentina continues to refuse to produce, the court found that the evidence shows his "personal involvement in YPF's business and confirm[s] that he likely has communications related to YPF's potential alter ego status," and that "there are substantial indicia that [he] is regularly involved in the Republic's relationship with BCRA." SA.56. The court ultimately allowed discovery of off-channel communications with respect to five of the officials as to whom Argentina had objected, and denied that discovery with respect to two officials. SA.55-62.

Argentina does not challenge any of the district court's specific findings of relevance with respect to the particular Argentine officials and state-owned enterprises as to which the district court ordered discovery. Instead, it generically argues that the district court's discovery order "seeks information that cannot possibly lead to executable assets." Arg.Br.39. None of its four reasons for that argument is persuasive.

First, Argentina asserts that "this Court and other courts have already held" that the five state-owned entities as to which the district court permitted discovery "are *not* alter egos" of Argentina. Arg.Br.39. In support of that assertion, Argentina cites one summary order from this Court in 2012, one decision from the Eleventh Circuit in 1987, and a footnote listing one other decision from this Court and a

47

handful of mostly unpublished district court decisions. Arg.Br.40-41. But as the district court explained, "[t]he fact that a prior court determined that an instrumentality was not an alter ego of [Argentina]" in the past "is of no moment," because the relevant question for post-judgment discovery whether the state-owned enterprise is an alter ego "today." SA.53-54; *see, e.g.*, *OI Eur. Grp. B.V. v. Bolivarian Republic of Venezuela*, 73 F.4th 157, 170-72 (3d Cir. 2023) ("[T]he alter-ego inquiry should consider all relevant facts up to the time of the service of the writ of attachment."); *OI Eur. Grp. B.V. v. Bolivarian Republic of Venezuela*, 663 F. Supp. 3d 406, 438-39 (D. Del. 2023) (circumstances relevant to alter ego analysis "can change at any time"). Argentina has no response to that reasoning, and makes no attempt to address the district court's detailed findings that Plaintiffs had shown a reason to believe that each of the state-owned enterprises as to which they seek discovery is a potential alter ego. *See* SA.62-66. That does not come close to showing that the district court abused its discretion.

Second, Argentina claims the district court had "no basis in the record" for concluding that discovery into its officials' off-channel communications regarding the potential alter-ego entities "would uncover any information relevant to plaintiffs' alter-ego theories." Arg.Br.41-42. That blinks reality. In fact, the record before the district court was replete with evidence that Argentine officials routinely use WhatsApp and other off-channel platforms for official business, including with

48

respect to state-owned enterprises. *See, e.g.*, JA.1311 (chart of officials' WhatsApp use); JA.1197, 1215 (officials' use of WhatsApp); PSA.71-86 (officials' use of Gmail and Yahoo); PSA.53-68 (officials' use of Gmail for YPF work in particular). The district court specifically cited evidence that included (1) public reporting on the widespread use of WhatsApp by senior officials, including Minister of Economy Luis Caputo, to conduct government business; (2) the use of personal email addresses, including Gmail, by senior government officials including Secretary of the Treasury Carlos Guberman; and (3) the pervasive use and publication of unofficial email addresses, including Gmail, by governmental officials and agencies as contact information. *See* SA.53 (citing JA.1311-18). Argentina's claim that the district court's findings were based only on "a single conclusory statement" or "a single news article" are pure invention. *Contra* Arg.Br.41. And, of course, the off-channel communications that Argentina has since produced only prove the point, showing that Argentine officials *have* in fact used off-channel communications to discuss official business with and even share documents with officials from Argentina's state-owned enterprises. *See supra* pp.19-21.

Third, Argentina claims that "even if the entities *were* found to be alter egos, their assets would be immune from execution under the FSIA," and so Plaintiffs should not be permitted to seek discovery as to those entities. Arg.Br.42. "That argument, however, has already been rejected by the Supreme Court." *Aurelius*, 589

49

F.App'x at 17 (citing *Republic of Argentina v. NML Cap., Ltd.*, 573 U.S. 134, 142-45 (2014)).  As the Supreme Court explained (to Argentina itself) in another case, "Argentina's self-serving legal assertion" that property is immune from execution does not control the scope of discovery.  *NML*, 573 U.S. at 144-45.  More generally, a judgment creditor is not required to "*prove*[] up front that all of the information it seeks is relevant to execution under the laws of all foreign jurisdictions"; instead, judgment creditors are entitled to discovery so that they "can identify where [the judgment debtor] may be holding property that *is* subject to execution."  *NML*, 573 U.S. at 145 & n.4.  Argentina's suggestion that Plaintiffs should be required to identify in advance the "specific property held by the purported alter egos that they wish to execute upon," and show in advance that "such property was used for the commercial activity on which their claim is based," would make it impossible for judgment creditors to obtain discovery unless they already have the information they seek to discover.  *Contra* Arg.Br.42.

Fourth, Argentina contends that under this Court's decision in *Peterson v. Bank Markazi*, 121 F.4th 983 (2d Cir. 2024), the district court "has no jurisdiction to enforce a judgment against [Argentina] by imposing alter-ego liability on any of these entities."  Arg.Br.43.  Again, Argentina puts the cart before the horse.  The question for present purposes is whether the requested discovery might lead to assets that could be used to satisfy the judgment, not whether a separate proceeding would

50

be required to execute on those assets. *Contra* Arg.Br.43-44. Indeed, this Court has made clear that judgment creditors may "seek disclosure related to assets held outside the jurisdiction of the court where the discovery request is made," regardless of whether execution on those assets would ultimately occur through a separate proceeding. *EM*, 695 F.3d at 208; *see id.* at 206 (assuming that "any future attachment or collection proceeding would be conducted in a foreign court").

In any event, Argentina overreads *Peterson*, which specifically recognized that a district court has "no need to exercise jurisdiction over a claim against the instrumentality" when the post-judgment proceeding is "against the foreign sovereign itself while seeking to attach assets belonging to the sovereign's instrumentality." 121 F.4th at 1000 n.6. *Peterson* therefore poses no bar to the requested discovery here, confirming that none of Argentina's arguments provides any reason for disturbing the district court's detailed findings as to each Argentine official and state-owned enterprise and its sound exercise of its discretion in determining that the requested discovery was relevant. *See* SA.55-66.

**B.     The District Court Properly Determined That the Requested Discovery Is Not Unduly Burdensome.**

Last and least, Argentina spends a scant page and a half arguing that the district court's discovery order is unduly burdensome. Arg.Br.44-45. Once again, Argentina cannot show that the district court erred in weighing the potential benefits and burdens of its discovery order, let alone that it abused its discretion in concluding

51

that the balance weighed in favor of granting discovery. As the district court explained, especially in light of Argentina's minimal production of official-channel communications, it was highly likely that the requested discovery of off-channel communications would lead to relevant evidence, and "[d]enying Plaintiffs the discovery at issue here would lead to unfairness because it would impact Plaintiffs' ability to recover on [their] $16 billion unpaid judgment." SA.50; *see* SA.52-53 (discussing "the small size of the productions of official communications so far"); SA.55-66 (detailed findings on Plaintiffs' preliminary showings with respect to each Argentine official and state-owned enterprise). Conversely, after acknowledging the need for "special vigilance to protect foreign litigants from the danger that unnecessary, or unduly burdensome discovery may place them in a disadvantageous position," and the required "due respect for any sovereign interest expressed by a foreign state," the district court determined that the overall balance "weighs in favor of collecting and reviewing off-channel communications to help [P]laintiffs determine whether the state-owned entities are alter egos." SA.51, 53; *see EM*, 695 F.3d at 207 (recognizing that "broad post-judgment discovery in aid of execution is the norm"); *In re "Agent Orange" Prod. Liab. Litig.*, 517 F.3d 76, 103 (2d Cir. 2008) (acknowledging the district court's "wide latitude to determine [the] scope of discovery").

Because Argentina cannot meaningfully dispute the district court's analysis, it resorts to hyperbole, asserting that the district court's order "intrudes on the personal devices and accounts of another sovereign's highest-ranking officials," in "the equivalent of another country ordering the U.S. Secretary of the Treasury to hand over his personal cellphone." Arg.Br.44. That is empty rhetoric. The district court's order does not "intrude on the personal devices and accounts" of any Argentine officials, let alone order them to "hand over [their] personal cellphone[s]" to a foreign power, *contra* Arg.Br.44; it simply requires Argentina to produce its public officials' communications regarding official public business (in particular, their interaction with various state-owned enterprises), which are public documents under Argentine law in any event. *See supra* pp.41-44. Nor does the order require former Argentine officials "to hand over their personal devices and accounts to their political rivals," *contra* Arg.Br.44; it simply requires Argentina to exercise its practical control over those former officials to obtain their communications relating to official business from their time in office. That is hardly an "intrusive and burdensome" request, let alone one that "would doubtless cause international conflict"—which is why Argentina is in fact already producing off-channel communications from many of its officials without incident. *Contra* Arg.Br.44. Argentina's "facile claims of undue burden" accordingly come nowhere near

53

showing that the district court abused its discretion in entering its discovery order.

*Outlaw v. City of Hartford*, 884 F.3d 351, 380 (2d Cir. 2018).

## CONCLUSION

For the foregoing reasons, this Court should either dismiss Argentina's appeal

from the district court's discovery order for lack of jurisdiction or affirm.

Respectfully submitted,

s/Paul D. Clement

MARK C. HANSEN
DEREK T. HO
ANDREW E. GOLDSMITH
KELLOGG, HANSEN, TODD,
FIGEL, & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, DC 20036

PAUL D. CLEMENT
C. HARKER RHODES IV
NICHOLAS A. AQUART
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com

SETH L. LEVINE
ALISON M. BONELLI
LEVINE LEE LLP
400 Madison Avenue, 8th Floor
New York, NY 10017

*Counsel for Plaintiffs-Appellees*

December 18, 2025

54

## CERTIFICATE OF COMPLIANCE

I hereby certify that:

1. This brief complies with the type-volume limitation of Local R. 32.1(a)(4)(A) because it contains 12,230 words, excluding the parts of the brief exempted by Fed.R.App.P. 32(f), as determined by the word counting feature of Microsoft Word 2016.

2. This brief complies with the typeface requirements of Fed.R.App.P. 32(a)(5) and the typestyle requirements of Fed.R.App.P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point font.

December 18, 2025

s/Paul D. Clement
Paul D. Clement

**CERTIFICATE OF SERVICE**

I hereby certify that, on December 18, 2025, an electronic copy of the foregoing brief was filed with the Clerk of Court using the ACMS system and thereby served upon all counsel appearing in this case.

s/Paul D. Clement
Paul D. Clement